UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
SABRINA SIMS,                       )
                                    )
      **Plaintiff,**              )
                                    )
      v.                         )   Civil Action No. 12-625 (ESH)
                                    )
DISTRICT OF COLUMBIA,               )
                                    )
      **Defendant.**             )
_____ )

## MEMORANDUM OPINION

On April 20, 2012, plaintiff, then a sergeant in the Metropolitan Police Department ("MPD"), filed suit against the District of Columbia alleging unlawful discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). (*See* Compl. [ECF No.1].) Following discovery, defendant moved for summary judgment on all counts. (*See* Mem. in Support of D.C.'s Mot. for Summ. J., Nov. 13, 2013 [ECF No. 23-1] ("Def.'s Mot.").) Plaintiff opposed this motion and filed her own motion for partial summary judgment on the issue of retaliation. (*See* Pltf.'s Opp. to District's Mot. for Summ. J., Dec. 6, 2013 [ECF No. 26] ("Pltf.'s Opp."); Pltf.'s Mot. for Partial Summ. J., Nov. 13, 2013 [ECF No. 22] ("Pltf.'s Mot.").) Based on a thorough examination of the record and for the reasons stated below, the Court will grant summary judgment for defendant on plaintiff's discrimination claim. On plaintiff's retaliation claim, both parties' motions for summary judgment will be denied, and on plaintiff's hostile work environment claim, defendant's motion for summary judgment will be denied.

**FACTUAL BACKGROUND**

Plaintiff joined the MPD in 1990 and began working in the Youth Investigations Branch ("Youth Division") in 1998. (Dep. of Sabrina Sims, June 11, 2013 [ECF No. 23-4] ("Sims Dep."), at 14-16.) Plaintiff remained in the Youth Division until December 2010, when, at her request, she was transferred to the Criminal Investigations Division ("CID"). (*Id.* at 84-85.) Today, plaintiff continues to work in the CID, where she was promoted to the rank of lieutenant in 2012. (*Id.* at 16, 22.)

The circumstances leading up to plaintiff's departure from the Youth Division underlie this lawsuit. In early 2010, plaintiff complained to Commander Charnette Robinson, the female head of the Youth Division, that she was giving preferential treatment to less senior male officers.[1] (*Id.* at 59; *see also* Pltf.'s Opp., Ex. 7 ("D.C Charge of Discrimination Form").) In April 2010, plaintiff complained to Assistant Chief Newsham about this allegedly discriminatory behavior and requested a transfer away from Commander Robinson. (Sims Dep. at 84-85.)

After plaintiff's transfer request was denied, she began receiving what she viewed as undesirable assignments from Commander Robinson. (*Id.* at 46-53, 94-95.) She was assigned to work short-term details outside of her unit lasting no more than several days and was also assigned to a Congressional Forum which, in her view, was unrelated to her duties. (*Id.* at 47-48, 94-95.) These assignments not only took plaintiff away from her regular work, but they did not provide opportunities for overtime and overtime pay. In June 2010, plaintiff was forced to work the midnight tour of duty for three to four weeks which plaintiff alleges, was "something no

---

[1] Robinson came to the Youth Division in March 2009. (Sims Dep. at 99.) Plaintiff testified at her deposition that she did not have any prior issues with her supervisors at the Youth Division until Robinson took over as Commander. (*Id.*)

other sergeant assigned to the unit ha[d] been required to do."[2] (*Id.* at 42, 118-19 (citing Pltf.'s Opp., Ex. 5 ("Formal EEOC Complaint"), Sept. 14, 2010 [ECF No. 26-5]).)

In September 2010, plaintiff filed a formal Equal Employment Opportunity ("EEO") complaint with the MPD's Diversity & Equal Employment Opportunity Compliance Branch ("MPD's EEO Office"), alleging unlawful gender discrimination, retaliation, and a hostile work environment. (*See* "Formal EEOC Complaint.") Plaintiff alleged that "Commander Charnette Robinson repeatedly affords the male sergeants opportunities over the female sergeants" and "having filed a grievance in reference to these matters [previously] . . . the actions displayed by Commander Robinson constitute retaliation. . . ." (*Id.*)

Specifically, plaintiff relied on two incidents. First, she discussed Commander Robinson's decision not to assign her to the "Bundy School" in March 2010. Despite the fact that plaintiff was the more senior sergeant, Commander Robinson instead assigned Sergeant Torrence, a male, to the desirable six-month detail. Following an intervention by plaintiff's union, plaintiff ultimately was assigned to the Bundy School detail in September 2010. However, unlike Sergeant Torrence, plaintiff was not given a set schedule of hours or days off. Instead, she was scheduled to work "rotating shifts" and train another sergeant. (*Id.*; *see also* Sims Dep. at 76-84.)

---

[2] Defendant contests the factual veracity of this claim citing to plaintiff's exhibits 10 and 13. (Reply to Pltf.'s Opp to D.C.'s Mot. for Summ. J. ("Def.'s Reply"), Dec. 24, 2013 [ECF No. 31], at 7.) These exhibits describe plaintiff's hours as 11:30 a.m. to 8 p.m. which, as defendant correctly notes, is not the midnight shift. However, in her deposition, plaintiff testified that unlike her co-workers, she was forced to work the midnight shift on a number of occasions. There seems to be some confusion over exactly when these midnight shifts were worked. However, at the summary judgment stage, the Court is required to accept all factual statements in support of the non-moving party. Fed. R. Civ. P. 56. Therefore, because there is a factual dispute on this issue, the Court will accept plaintiff's contention that she worked the midnight shift as true for purposes of deciding this motion.

Plaintiff also described an incident when Commander Robinson informed male sergeants of training opportunities but failed to discuss those training opportunities with her. (*See* Formal EEOC Complaint; Sims Dep. 62-65.) Even after plaintiff asked Commander Robinson about the training opportunities directly, the Commander said that she would "get back" to plaintiff and "give [her] the information." (Sims Dep. at 66.) Later, after plaintiff applied for these training programs, her application was passed over in favor of the less-senior, male sergeants. In plaintiff's view, she was "repeatedly overlooked and intentionally excluded" from training programs in retaliation for her claims of discrimination. (*See* Formal EEO Complaint.)

After plaintiff filed her formal EEO complaint in September, she claims that she was subjected to further retaliatory action in the form of disciplinary actions. In October 2010, less than one month after she submitted the formal EEO complaint, plaintiff was issued a "Work Performance Plan" (WPP) over the objections of her immediate supervisor, Lieutenant Tate. (Sims Dep. at 67-76; Pltf.'s Opp., Ex. 3, Dep. of Alphonso Augustus Lee, Vol. 2., Sept. 19, 2013 [ECF No. 26-3], 134-35.) Plaintiff was informed that she had been placed on a WPP because she had overdue reports. However, prior to being placed on the WWP, plaintiff was not made aware of any problems with her work performance. (Sims Dep. at 72-73.) Moreover, no other officers in the Youth Division were put on WPPs in 2010, despite the fact that some officers had a greater number of overdue reports than plaintiff. (*Id.* at 127-129.) Later that month, Commander Robinson relied on the fact that plaintiff was on a WWP to deny training opportunities that plaintiff had requested. (*Id.* at 85-88, 94; *see also* Pltf.'s Opp., Ex. 8 (e-mail from Sims to Lee, Oct. 26, 2010).)

During October and November of 2010, Commander Robinson questioned plaintiff about her EEO Complaint and refused to let her respond in writing to a co-worker's EEO complaint.

(Sims Dep. at 111-13, 135-36.) In December 2010, Commander Robinson denied plaintiff's leave request without any explanation. Only after plaintiff complained to Commander Robinson's supervisor, Assistant Chief Newsham, was her request for leave granted. (*Id.* at 138-39.)

In response to plaintiff's formal EEO complaint, Alphonso Lee (an MPD EEO official) conducted an investigation. (Pltf.'s Opp., Ex. 2, Dep. of Alphonso Augustus Lee, Vol. 1., Sept. 19, 2013 [ECF No. 26-2] ("Lee Dep., Vol. 1."), 35-44.) Though Mr. Lee concluded based on his investigation that there was insufficient evidence to sustain plaintiff's claim of gender-based discrimination, he "sustained" plaintiff's retaliation claim, explaining that "there was a probability that retaliation [by Commander Robinson] occurred" based on "the allegations proffered by Lieutenant Sims, and the information collected after the allegation was made." (*Id.* at 41-42.) On December 2, 2010, the Assistant Chief of Police "concur[ed] with [the] findings" of Mr. Lee that retaliatory misconduct likely took place. (Pltf.'s Opp., Ex. 6.) Later that month, plaintiff was transferred to the CID where she continues to work apparently without difficulty. (*See* Sims Dep. at 85.)

## ANALYSIS

### I. STANDARD OF REVIEW

A district court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Talavera v. Shah,* 638 F.3d 303, 308 (D.C. Cir. 2011). A "material fact is one that 'might affect the outcome of the suit under governing law.'" *Talavera,* 638 F.3d at 308 (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986)). For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. at 248. In ruling on a motion for summary judgment, a court must "view all facts and draw all reasonable inferences in favor of the nonmoving party." *Brosseau v. Haugen,* 543 U.S. 194, 195 n.2 (2004); *Youngberg v. March,* 676 F.3d 1114, 1117 (D.C. Cir. 2012). A court should grant summary judgment only if "no reasonable jury could reach a verdict in [the non-moving party's] favor." *Jones v. Bernanke,* 557 F.3d 670, 674 (D.C. Cir. 2009).

## II.   DISCRIMINATION

In order to succeed on a claim of unlawful discrimination under Title VII, plaintiff first must establish a prima facie case that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Though in this case plaintiff is a member of protected class by virtue of her gender, the parties disagree on whether she has sufficiently articulated an adverse employment action for purposes of establishing a prima facie case of discrimination. Because the Court agrees with the defendant that plaintiff has failed to identify an adverse employment action, defendant's motion for summary judgment as to this claim will be granted.

In the discrimination context, an adverse employment action is defined narrowly as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009) (citations and internal quotation marks omitted). "[A]n employee suffers an adverse employment action if [s]he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future

6

employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown v. Brody,* 199 F.3d 446, 457 (D.C. Cir. 1999)). In most circumstances, tangible harm "inflicts *direct* economic harm." *Douglas,* 559 F.3d at 552 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 762 (1998)). Where the alleged significant change in employment status is not obvious, "an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm." *Douglas,* 559 F.3d at 553.

In support of her claim, plaintiff identifies two allegedly adverse employment actions taken by defendant. First, she argues that "involuntary details negatively affected her work schedule." (Pltf.'s Opp. at 30.) Second, plaintiff contends that she "lost pay, including overtime pay, when Commander Robinson detailed [her] to the Presidential Summit in April 2010 and the Child Advocacy Center in April 2010." (*Id.*) Defendant responds that these undesirable assignments are, as a matter of law, not materially adverse employment actions. (*See* Def.'s Reply at 4-5.) Moreover, it argues, there is insufficient evidence in the record to conclude that plaintiff in fact "lost pay, including overtime pay." (*Id.* at 2-3.) At most, in defendant's view, plaintiff has presented evidence that she lost "the opportunity to receive overtime work and compensation," but the mere loss of the opportunity for overtime cannot qualify as an adverse action absent additional evidence. (*Id.*)

In response to plaintiff's first allegedly adverse action, defendant is correct that plaintiff's claim does not rise to the level of an adverse action sufficient to establish a prima facie case of decimation. The Court of Appeals has held on several occasions that "purely subjective injuries, such as dissatisfaction with a reassignment," are not adverse employment actions for purposes of establishing a prima facie case of discrimination. *Forkkio*, 306 F.3d at 1130-31; *Douglas*, 559

7

F.3d at 552. Plaintiff's allegation that temporary detail assignments "negatively affected her work schedule" unquestionably falls into this category of non-actionable "dissatisfaction."

In response to plaintiff's second allegedly adverse action, defendant is also correct that plaintiff has failed to offer a factual basis for the claim that she "lost pay" or "overtime pay." (Def.'s Reply at 2-3.) At most, the record demonstrates that plaintiff may have lost the opportunity to earn overtime pay while participating in the two short-term detail assignments lasting as little as one day. (*See* Sims Dep. 46-47.) Though the Court of Appeals has not specifically addressed whether the mere potential for lost overtime pay may constitute an adverse action, Judge Bates has considered the issue holding, "lost opportunity for overtime (assuming plaintiff has proven there were opportunities to work overtime) is only an adverse employment action where the trier of fact could reasonably conclude that plaintiff in the past sought opportunities for overtime pay or it was otherwise known to defendant that plaintiff desired such opportunities."[3] *Bell v. Gonzales*, 398 F. Supp. 2d 78, 97 (D.D.C. 2005). This standard is supported by the fact that overtime is not "universally regarded as desirable" and the "[i]mposition of a requirement to work overtime against the wishes of an employee, even for pay . . . has been recognized as an adverse employment action." *Id.* (citing *Dickerson v. SecTek, Inc.,* 238 F. Supp. 2d 66, 76-77 & n.5). Moreover, all of the federal courts of appeal that have considered this question have adopted similar approaches.[4]

---

[3] *Bell* concerned a claim of retaliation (not discrimination), but was considered at a time when the "adverse action" standard was the same for discrimination and retaliation claims. More recently, applying this standard in the discrimination context, another district court noted that plaintiff's discrimination claim could go forward where "the plaintiffs have alleged both that overtime opportunities existed *and that they actively pursued those opportunities*. Saint-Jean v. D.C.*, 844 F. Supp. 2d 16, 22 n.6 (D.D.C. 2012) (emphasis added). No such evidence that Sims pursued overtime opportunities exists in this case.

[4] *See, e.g.*, *Lewis v. City of Chicago*, 496 F.3d 645, 653-54 (7th Cir. 2007) (holding that denying opportunities for overtime that constitute "a significant and recurring part of an employee's total earnings

Plaintiff fails to offer sufficient factual evidence to establish a materially adverse action under this standard. In *Bell*, the "[p]laintiff's declaration and deposition testimony . . . provide[d] evidence from which a trier of fact could reasonably conclude that defendant[] w[as] aware of plaintiff's desire to work overtime. . . ." 398 F. Supp. 2d at 97. Here, plaintiff has failed to identify any such evidence. She has not alleged, for example, that she was interested in working overtime, that her supervisor was aware that she was interested in working overtime, or that she was going to receive overtime pay absent the detail assignments. To the contrary, the record demonstrates only that she was assigned to detail assignments that lasted no more than a several days that did not provide opportunities for overtime. Furthermore, unlike the plaintiff in *Lewis v. City of Chicago*, the plaintiff in this case is unable to "construct from the evidence an argument that by denying her the opportunity . . . she lost her ability to potential[ly] . . . earn many hours of overtime." 496 F.3d at 653. Instead, the evidence presented demonstrates that she lost the potential for overtime pay on a limited number of occasions.

For these reasons, no reasonable jury could conclude that defendant's actions affected the terms, conditions, or privileges of employment or future employment opportunities. The Court therefore will grant defendant's motion for summary judgment on the claim of discrimination.

## III. RETALIATION

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any

---

similar to a recurring raise" could represent an adverse employment action, but "insignificant and nonrecurring [overtime] like a discretionary bonus" could not); *Broska v. Henderson*, 70 F. App'x 262, 267-68 (6th Cir. 2003) ("While we again stress that allegations of a denial of overtime, properly supported, could constitute an adverse employment action, [plaintiff] has put forth virtually no evidence on the overtime issue."); *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1118 (11th Cir. 2001) (holding that the denial of overtime pay and other discretionary pay "deprived Bass of compensation which he otherwise would have earned [and therefore constituted] adverse employment actions for purposes of Title VII").

practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To succeed on a retaliation claim, a plaintiff must establish that "(1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer," *Jones v. Bernanke,* 557 F.3d 670, 677 (D.C. Cir. 2009); and (3) that "his . . . protected activity was a but-for cause of the . . . adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (June 24, 2013).

A plaintiff may establish unlawful retaliation in one of two ways. She may rely on direct evidence, if such evidence exists. *See Jones*, 557 F.3d at 679. If not, she must rely on circumstantial evidence under the familiar burden-shifting framework set out by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-03 (1973). *See id.* Under this approach, she first must establish a prima facie case of retaliation. Then, the burden shifts to the employer "to articulate some legitimate, non-[retaliatory] reason" for the adverse action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Jones*, 557 F.3d at 677. If the employer satisfies that burden, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence." *Jones,* 557 F.3d at 677.

Both parties have filed motions for summary judgment on plaintiff's retaliation claim. Plaintiff's motion for partial summary judgment alleges that there is direct evidence of retaliation and that there is therefore "no questions of material fact in dispute that Defendant retaliated against her," or in the alternative, "that she has [conclusively] shown a prima facie case of retaliation." (Pltf.'s Mot. at 4, 18-19.) Defendant, on the other hand, moves for summary

judgment on the grounds that there is no direct evidence of discrimination and, although there is sufficient evidence that plaintiff undertook protected activities, she has failed to identify an adverse action or demonstrate that her protected activity was the but-for cause of an adverse action for purposes of establishing a prima facie case of retaliation. (Def.'s Mot. at 8-10.) For the reasons set forth below, the Court will deny both motions.

### A. Plaintiff's Motion for Partial Summary Judgment

In her motion for partial summary judgment, plaintiff alleges that because "the District admits to retaliating against Ms. Sims," "there is direct evidence of retaliation" and "there are no questions of material fact in dispute that Defendant retaliated against [plaintiff]." (Pltf.'s Mot. at 18-19.) The Court disagrees.[5]

Under Title VII, "[d]irect evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference.* Such evidence includes any statement or written document showing a discriminatory motive *on its face.*" *Manuel v. Potter*, 685 F. Supp. 2d. 46, 61 n.11 (D.D.C. 2010) (quoting *Lemmons v. Georgetown Univ. Hosp.,* 431 F. Supp. 2d 76, 86 (D.D.C. 2006)) (emphasis in original)). As the First Circuit has explained, direct evidence is "'a smoking gun' showing that the decisionmaker *relied upon* a protected characteristic in taking an employment action." *PowerComm, LLC v. Holyoke Gas & Elec. Dep't,* 657 F.3d 31, 35 (1st Cir. 2011) (citing *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 421 (1st Cir. 1996)). Such "[d]irect evidence is rare." *Portis v. First Nat. Bank*, 34 F.3d 325, 328

---

[5] Defendant responds to plaintiff's allegations regarding direct evidence by focusing on the inadmissibility of this evidence. However, the dispositive issue is not whether plaintiff's "direct evidence" is admissible, but rather if it is "direct evidence" at all. The Court need not address defendant's admissibility argument, but rather it will focus only on the proper characterization of the evidence.

(5th Cir. 1994). In the Court's view, the standard for what constitutes "direct evidence" in the Title VII discrimination context is equally applicable in the Title VII retaliation context.

The "direct evidence" that plaintiff identifies in her motion is the finding made by the MPD EEO Officer, Alphonso Lee, "sustaining" the allegation that unlawful retaliation likely took place. (Pltf.'s Mot. at 18-19.) However, contrary to plaintiff's view, an after-the-fact determination based on an internal investigation by an MPD EEO Officer is not "direct evidence" of retaliation. As Lee explained in his 30(b)(6) deposition, his conclusion that "there was a probability that retaliation [by plaintiff's supervisor] occurred" was based on "the allegations proffered by Lieutenant Sims, and the information collected after the allegation was made." (Lee Dep., Vol. 1., at 41.) In other words, Mr. Lee made a quasi-judicial finding based on an internal review of circumstantial evidence. Mr. Lee's conclusions do not transform this circumstantial evidence into direct evidence simply because he is employed by the defendant. Plaintiff's motion must therefore be denied.

### B. Defendant's Motion for Summary Judgment

Defendant contends that it is entitled to summary judgment on plaintiff's retaliation claim on the grounds that plaintiff has failed to articulate a "materially adverse action" sufficient to establish a prima facie case. (Def.'s Mot. at 8.) In response, plaintiff identifies twelve actions which, in her view, constitute materially adverse actions taken by defendant in retaliation for her participation in protected activities.[6] (Pltf.'s Opp. at 23-25.) Because the Court agrees with the

---

[6] These actions include: (1) assigning plaintiff to "undesirable details"; (2) placing her on a Work Performance Plan ("WPP") over the objection of Lieutenant Tate; (3) initially refusing to assign her to a desirable post at the Bundy School and, once assigned, denying her a regular schedule of hours or set days off; (4) requiring her to work the midnight shift; (5) giving her negative remarks on her performance evaluation; (6) asking her about her EEO complaint during an unrelated, yet recorded interview; (7) refusing to let her respond in writing to questions pertaining to a co-worker's EEO complaint; (8) requiring her to remain in the department for three months after her retaliation allegation was sustained by

plaintiff that a reasonable jury could conclude that some (though not all) of these actions rise to the level of materially adverse actions, defendant's motion for summary judgment will be denied.[7]

As the Supreme Court explicitly held in *Burlington Northern v. Santa Fe Railway Co.*, 548 U.S. 53, 64 (2006), Title VII's retaliation provision is broader than the substantive antidiscrimination provisions. Retaliation claims, therefore, are "not limited to discriminatory actions that affect the terms and conditions of employment," but rather prohibit any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 64, 68 (internal citations and quotation marks omitted); *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008) ("'Adverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim.") This is not to say that any action taken by defendant that negatively affects plaintiff may constitute a sufficient basis for bringing a retaliation claim. Rather, courts still "speak of *material* adversity because . . . it is important to separate significant from trivial harms. Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Burlington,* 548 U.S. at 68 (emphasis in original) (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80

---

the MPD EEO Office and nine months after she requested a transfer; (9) not informing her of training programs and refusing to provide requested training information when she expressed interest; (10) not selecting her for training on the grounds that she was on a WPP; (11) initially denying her leave (though eventually approving it); and (12) forcing her to withstand negative comments from her co-workers. (*See* Pltf.'s Opp. at 23-25.)

[7] Defendant also argues, albeit briefly, in its motion for summary judgment that "there is no record evidence linking any of these allegations to the plaintiff's filing of an EEO complaint." (Def.'s Mot. at 10.) In so arguing, defendant attempts to call into question the causation element of plaintiff's prima facie case. However, defendant completely ignores the temporal proximity between the protected activities and the allegedly adverse actions. *See Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001); *Hamilton v. Geithner,* 666 F.3d 1344, 1357 (D.C. Cir. 2012). The Court will therefore focus exclusively on the issue of whether plaintiff has demonstrated the existence of materially adverse actions.

(1998)); *see also Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) ("Actionable retaliation claims are limited to those where an employer causes "*material* adversity," not "trivial harms.") At the same time, the adverse action standard for retaliation claims is phrased in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Test v. Holder*, 614 F. Supp. 2d 73, 84 (D.D.C. 2009) (quoting *Burlington,* 548 U.S. at 69).

While plaintiff is generally required to identify a particular adverse action in order to establish a prima facie case of retaliation, courts within this jurisdiction have recognized that it is at times difficult to "examine whether any isolated action, on its own, qualifies as 'adverse.'" *Test*, 614 F. Supp. 2d at 84. Therefore, in addition to considering the merits of each allegedly retaliatory act, the court also must consider whether, "based upon the combined effect of . . . alleged events, a reasonable worker could be dissuaded from engaging in protected activity." *Id.* (internal quotations and citation marks omitted); *see also Mogenhan v. Napolitano,* 613 F.3d 1162, 1166 (D.C. Cir. 2010) (explicitly considering plaintiff's allegedly retaliatory actions individually as well as a group when determining whether they were materially adverse).

As an initial matter, the Court concludes that seven of the twelve allegedly adverse actions identified by plaintiff do not rise to the level of materially adverse employment actions, even under *Burlington Northern*'s more forgiving standard. These incidents include: (1) assigning plaintiff to "undesirable details"; (2) asking her about her EEO complaint during an unrelated, yet recorded interview; (3) refusing to let her respond in writing to questions pertaining to a co-worker's EEO complaint; (4) requiring her to remain in the Youth Division for three months after her retaliation allegation was sustained by the MPD EEO Office and nine months after she initially requested a transfer; (5) not informing her of training opportunities and

refusing to provide this information when asked; (6) temporarily assigning plaintiff to the midnight shift; and (7) forcing her to withstand negative comments from her co-workers.

Specifically, the allegations the plaintiff was detailed to undesirable positions, she was not immediately transferred to a new department after her retaliation claim was sustained, and she was required to temporarily work midnight shifts demonstrate only "less favorable assignments," which, as the D.C. Circuit has explained, do not rise to the level of materially adverse actions for purposes of sustaining a retaliation claim. *See Jones*, 429 F.3d at 281. Similarly, the other allegedly adverse actions described above represent, at most, "minor inconveniences . . . [that do] not rise to the level of adverse action necessary to support a [prima facie retaliation] claim." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (internal citations and quotation marks omitted).

In addition, plaintiff's claim that defendant "provided negative remarks on her performance evaluation" is not supported by the record. The only two citations in the record that plaintiff relies on in support of this proposition demonstrate that plaintiff was put on a work performance plan, not that anyone gave her an additional negative evaluation while she was on that work performance plan. (*See* Sims Dep. at 72-73 (describing plaintiff's placement on the WPP); Pltf.'s Opp., Ex. 9 (Dep. of Mark V. Carter, Sr., Sept. 16, 2013 [ECF No. 26-9], at 53) (describing the fact that MPD was unaware of any concerns regarding plaintiff prior to her placement on the WPP).)

Once these eight allegedly adverse actions are removed from the equation, the four claims that remain are that: (1) plaintiff was put on a work performance plan over the objection of her immediate supervisor; (2) she was denied training opportunities on the ground that she was on the work performance plan; (3) she was initially denied a desirable post at the Bundy

15

School and, after she finally received the assignment, was denied a regular schedule of hours or set days off; and (4) she was denied leave by her Commander Robinson, though her leave request was later granted by the Assistant Chief when she appealed Commander Robinson's decision. (*See* Pltf.'s Opp. at 23-25.) For the reasons discussed below, the Court concludes that a reasonable jury could find that individually and as a group these adverse actions would dissuade a reasonable person from "making or supporting a charge of discrimination." Therefore, defendant's motion for summary judgment must be denied.

First, regarding plaintiff's work performance plan, defendant contends that "the sole act of placing a plaintiff on a [performance improvement plan without] more does not constitute an adverse employment action." (Def.'s Reply at 7 (citing *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 71 (D.D.C. 2012)).) While an accurate characterization of the law, it is of little help to defendant's case. Plaintiff does not only allege that she was placed on a work performance plan, she also alleges that the work performance plan was relied upon as a basis to deny her training opportunities. (*See* Sims Dep. at 87; Pltf.'s Opp., Ex. 15.) While alone the denial of training opportunities or placement on a work performance plan might be insufficient to establish a prima facie case of retaliation, because the denial of training was directly tied to the work performance plan, the Court is satisfied that a reasonable jury could conclude that defendant undertook a materially adverse action. *Cf. Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010).

Second, regarding her detail at the Bundy School, plaintiff alleges that she was initially denied her detail request and, once given the detail, she was denied a regular schedule of hours or set days off. (*See* Sims Dep. at 76-83.) While the initial denial fails to rise to the level of an adverse employment action (and likely occurred prior to plaintiff's protected activities), the denial of a regular schedule or days off constitutes a denial of regular privileges of employment.

16

As such, it may constitute an adverse action for purposes of establishing a prima facie case of retaliation. *See Ginger v. D.C.*, 477 F. Supp. 2d 41, 50 (D.D.C. 2007) (holding, albeit in the more stringent discrimination context, that "it is hard to say that a change from a permanent [] shift to a rotating shift . . . is not a change in the conditions or privileges of employment sufficient to constitute an adverse employment action") (citing *Freedman v. MCI Telecomms. Corp.,* 255 F.3d 840, 844 (D.C. Cir. 2001)).

Third, regarding the denial of plaintiff's leave request by Commander Robinson, defendant argues that because plaintiff's request was ultimately granted by the Assistant Chief it cannot constitute a materially adverse action. (Def.'s Reply at 6-7.) In support of this contention, defendant cites *Stewart v. Evans*, 275 F. 3d 1126, 1135 (D.C. Cir. 2002), for the proposition that "Title VII does not provide relief for victims of attempted retaliation." (*Id.*) However, *Stewart* pre-dates *Burlington Northern* and explicitly relies on the more restrictive standard that all materially adverse actions must affect the "terms, conditions, or privileges with employment." Under the less restrictive *Burlington Northern* standard, however, the Court must now focus exclusively on whether the adverse action "might [] dissuade[] a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 64. Framed in this way, the ultimate outcome of plaintiff's leave request is of far less importance than the fact that it was initially denied. If a supervisor is permitted to deny an individual's leave request in retaliation for engaging in a protected activity, the Court is satisfied that a reasonable jury could conclude that this would deter individuals from engaging in the protected activities in the first place, even if these individuals know they have the right to appeal denials of leave to their supervisor's supervisor. Therefore, after *Burlington Northern*, attempted retaliation can in circumstances such as this one serve as a sufficient basis for establishing a prima facie case of retaliation.

Finally, the Court recognizes that it is difficult, if not impossible, to "examine whether any isolated action, on its own, qualifies as adverse." Instead, courts must consider whether "based upon the combined effect of . . . alleged events, a reasonable worker could be dissuaded from engaging in protected activity." *Test*, 614 F. Supp. 2d at 84 (internal quotations and citation marks omitted). In this case, though the Court concludes that several of the alleged materially adverse actions could stand on their own for purposes of establishing a prima facie case of retaliation, it must also be noted that plaintiff has met her initial burden based on the totality of the allegedly retaliatory actions as well.

For these reasons, the Court will deny both defendant's and plaintiff's motions for summary judgment on plaintiff's retaliation claim.

## IV. HOSTILE WORK ENVIRONMENT

Plaintiff also alleges that she was subjected to a hostile work environment arising out of the twelve incidents offered in support of her unlawful retaliation claim. While plaintiff is not precluded from relying on the same underlying incidents in support of her hostile work environment claim, the metric for success on a hostile work environment claim is different from a claim of retaliation. *See Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011) (describing the differences between a claim for retaliation and a claim for a retaliatory hostile work environment). Unlike a retaliation claim, where a plaintiff must demonstrate that an adverse action or actions were taken because plaintiff engaged in protected activity, in order to succeed on a hostile work environment claim she must instead show, "that h[er] employer subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"

*Baloch v. Kempthorne,* 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

To determine whether an environment is "hostile," courts look to "'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris,* 510 U.S. at 23). Here, defendant argues that "[t]he conduct about which Sims complains simply does not reach this [hostile work environment] threshold . . . [and t]he Court therefore dismiss plaintiff's hostile work environment claim." (Def.'s Reply at 11.) In plaintiff's view, however, "[t]he evidence establishes that Commander Robinson took every opportunity, no matter how slight, to create a hostile work environment for [plaintiff.]" (Opp. at 31.)

It is beyond dispute that defendant took a number of actions detrimental to plaintiff in the wake of her protected activities between April and December 2010. Based on a careful review of the record and for the reasons discussed above regarding plaintiff's retaliation claim, the Court holds that a reasonable jury could conclude that she was subjected to an unlawful retaliatory hostile work environment. Therefore, the Court will deny defendant's motion for summary judgment on plaintiff's hostile work environment claim as well.

## CONCLUSION

Accordingly, and for the reasons stated above, defendant's motion for summary judgment will be **GRANTED** as to plaintiff's discrimination claim but will be **DENIED** on plaintiff's retaliation and hostile work environment claims. Plaintiff's motion for partial summary judgment on retaliation will also be **DENIED.** A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: February 6, 2014